**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JONILY L. JOVAN and LUIS ZEPEDA,** : | | **Civil Action No. 1:05-CV-2443** |
| **Plaintiff** | : | |
| | : | **(Chief Judge Kane)** |
| **v.** | : | |
| | : | |
| **PILGRIM'S PRIDE CORP.,** | : | |
| **Defendant** | : | |

<u>**MEMORANDUM**</u>

Before this Court is Defendant's motion for summary judgment (Doc. No. 31) and

Plaintiffs' motion to amend the pleadings (Doc. No. 43).  The motions are ripe for disposition.

For the following reasons, the Court will grant Defendant's motion in part and deny it in part,

and will deny Plaintiffs' motion.

**I.     BACKGROUND**

During the time relevant to this litigation, Plaintiffs Jonily Jovan and Luis "Eddie"

Zepeda worked in the human-resources ("HR") department of Defendant Pilgrim's Pride Corp.'s

facility in New Oxford, Pennsylvania.  Pilgrim's Pride is a poultry processing company.  The

circumstances surrounding the termination of their employment are at the core of this case.

Jovan is a native of Sri Lanka.  In 2002, he applied for and received political asylum in

the United States.  Before arriving in the United States, Jovan trained in computer technology

and programming in Germany and England.  In December 2002, Pilgrim's Pride hired Jovan to

work as a computer-data-entry worker, but he was quickly promoted to Benefits Coordinator and

ultimately to Benefits Administrative Assistant by March 2004.  As a Benefits Administrative

Assistant, Jovan had substantial responsibilities, including entering data into Pilgrim's Pride's

HR system (referred to as SAP), verifying prospective employees' employment eligibility

through use of software called "Basic Pilot," preparing reports related to payroll, recruiting, and administration of employment benefits.  According to personnel records, Jovan's promotions were recommended because of his "[e]xcellent knowledge of SAP," his efforts to "expand[] SAP use to other Pilgrim's Pride Forms reducing paperwork & time" and by increasing savings through improved efficiency.  (Pls' Ex. D.)

Zepeda is a naturalized United States citizen who was born in Mexico.  In 1989, Defendant's predecessor at the New Oxford facility hired Zepeda to work on the turkey processing line.  In 1996, Zepeda moved to the HR department as a trainer and by 2002 was promoted to Employment Coordinator.  Zepeda, like Jovan, received exemplary performance reviews.  As Employment Coordinator, Zepeda's responsibilities included the preparation of hiring paperwork and identification, and orientation of new hires.

In December 2003, Sterling Feeser, the New Oxford HR Manager, took vacation leave. Before he could return, however, he was diagnosed with cancer, and accordingly took disability leave.  In May 2004, Regional Human Resources Director Pat Gravatt brought Olga Anderson, the HR Manager at the Pilgrim's Pride facility in Hinton, Virginia, to the New Oxford facility during Feeser's leave.  Although Anderson initially commuted between the Hinton and New Oxford facilities, she permanently relocated to the New Oxford facility on October 25, 2004.

Almost immediately after she arrived at the New Oxford facility, tensions developed between Anderson and the employees in the HR department.  According to Plaintiffs, Anderson would often use profanities in the workplace, would call employees stupid, and repeatedly belittled employees.  Plaintiffs also attested that Anderson made racially insensitive and sometime offensive remarks related to Jovan's national origin.  Anderson's conduct upset Jovan

2

to the point that he told Daye Boyer, the Complex Plant Manager, that he intended to resign. Boyer convinced him not to leave.  Another HR employee, Rebecca Barth, testified in her deposition that Anderson, who was Puerto Rican, "had an opinion against white people in general, against Mexican people, against men."  (Barth Dep. 54.)

On October 25, 2004, the same day that Anderson permanently relocated to the New Oxford facility, the 2005 "Open Enrollment" season began.  Open Enrollment is a 3-4 week period during the fall in which employees are allowed to change their benefits plans.  As the Benefits Administrative Assistant, Jovan was responsible for conducting Open Enrollment.  In previous years, Jovan used individual and small-group sessions to assist employees through the Open Enrollment process.  Due to the large Spanish-speaking population at the New Oxford facility, Jovan would seek assistance from other staff members to help him communicate with employees.  Furthermore, Jovan would use pre-printed forms that he created to improve the process.

On November 2, 2004, Jovan met with Boyer and Anderson to discuss the status of Open Enrollment.  During the meeting, Jovan indicated that he would not able to complete Open Enrollment because Anderson had obstructed his efforts by refusing him the assistance of Spanish-speaking staff, not permitting him to conduct small-group sessions, and not allowing him to use the pre-printed forms.  Jovan expressed his frustration to Boyer, and indicated that he would not be "held responsible" for any shortcomings in the Open Enrollment process.  Jovan also indicated that he wanted to be transferred to the "kill line" to do labor work rather than work under Anderson.  Jovan requested and was granted two days of vacation leave.  On November 4, 2004, Jovan's employment was terminated for insubordination during the November 2 meeting.

3

Jovan then initiated unemployment proceedings with the Department of Labor & Industry for the Commonwealth of Pennsylvania and filed a Charge of Discrimination with the Equal Employment Opportunity Commission.  Jovan alleged that Pilgrim's Pride wrongfully terminated his employment, and that Pilgrim's Pride – Anderson in particular – had forced him to engage in illegal hiring practices.

As a result of Jovan's allegations, Pilgrim's Pride conducted an internal investigation into its hiring practices.  After an audit of I-9 forms as part of the investigation, 120 employees were fired from the New Oxford facility.  Zepeda became responsible for hiring new employees and received training on the I-9 employment verification process.  Although the amount of paperwork increased, Anderson denied Zepeda overtime and refused him any assistance.  Additionally, Anderson began treating Zepeda coldly at work.

On July 22, 2005, Zepeda presented Patricia Gravatt with a stack of I-9 forms that he confirmed were accurate.  Gravatt reviewed the documentation and concluded that the forms were incomplete and otherwise deficient.  On July 27, 2005, Zepeda's employment was terminated.

On November 23, 2005, Jovan filed a complaint in this Court alleging that Defendant discriminated against him on the basis of national origin.  (Doc. No. 1.)  On December 9, 2005, Jovan amended the complaint to include Zepeda as a plaintiff.  (Doc. No. 3.)  On February 6, 2006, Defendant filed an answer, asserting various defenses.  (Doc. No. 7.)

During discovery, Plaintiffs learned that Johana Vasquez, a former employee of Pilgrim's Pride, had written a letter to Anderson indicating that Zepeda tried to sell Vasquez a job with Pilgrim's Pride.  Additionally, Plaintiffs discovered an email from Patricia Gravatt to Jane

4

Brookshire, the Executive Vice President for Human Resources, that repeated Vasquez's allegation.

On October 12, 2006, Defendant moved for summary judgment.  (Doc. No. 31.)  The parties fully briefed the motion.  On November 27, 2006, Plaintiffs moved for leave to file a second amended complaint to include a count of defamation against Defendant.  (Doc. No. 43.)  The parties briefed Plaintiffs' motion.  On January 19, 2007, upon the parties' request, a hearing was held before this Court.  The motions are ripe for disposition.

## II.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-51 (1986).  When deciding a motion for summary judgment, the Court views the facts in the light most favorable to the nonmoving party, who is "entitled to every reasonable inference that can be drawn from the record."  Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 788 (3d Cir. 2000).  However, the nonmoving party may not simply sit back and rest on the allegations in the complaint, but must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (internal quotations omitted).  Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial."  Id. at 322.

## III.    DISCUSSION

Jovan and Zepeda brought four counts in their amended complaint.  In Counts I and II, Plaintiffs allege employment discrimination on the basis of national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 ("Title VII"), and the Pennsylvania Human Relations Act, 43 Pa. Stat. Ann. § 951 et seq. ("PHRA").[1]  In Count III, Plaintiffs allege state-law wrongful-discharge claims as well as allegations of retaliation under Title VII, 42 U.S.C. § 2000e-3.  In Count IV, Plaintiffs allege that Defendant was negligent in supervising its employees.  Defendants have moved for summary judgment on all counts.

### A.    Jovan's Title VII claims

Title VII prohibits an employer from "discriminat[ing] against any individual . . . because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1). Jovan alleges that Defendant violated Title VII by creating a hostile work environment and by discriminating against him in terminating his employment.  The Court will address each in turn.

### 1.    Hostile work environment

The Supreme Court has held that Title VII is violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotations and citations omitted).  The Third Circuit requires a plaintiff to establish five elements for a prima facie hostile-work-environment claim: "(1) she suffered intentional discrimination because of her

---

[1] The Court's analysis under Title VII and the PHRA are identical in this case.  Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 317 n.3 (3d Cir. 2000).

[national origin]; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present." Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006); West v. Philadelphia Elec. Co., 45 F.3d 744, 753 (3d Cir. 1995).  In this case, only the second and fourth elements – whether the discrimination was "severe or pervasive" and whether the harassment was objectively offensive – are in dispute.

When assessing the severity or pervasiveness of discriminatory harassment, the court must look to the record "as a whole to decide whether the plaintiff has proved his or her case [and] concentrate not on individual incidents, but on the overall scenario." Cardenas v. Massey, 269 F.3d 251, 260-61 (3d Cir. 2001) (quoting Durham Life Ins. Co. v. Evans, 166 F.3d 139, 149 (3d Cir. 1999)).  Accordingly, the Court must consider the context in which the alleged harassment occurred, and must evaluate "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Abramson v. William Paterson Coll., 260 F.3d 265, 280 (3d Cir. 2001).

The Supreme Court has cautioned that the "standards for judging hostility are sufficiently demanding to . . . filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (quoting B. Lindemann & D. Kadue, Sexual Harassment in Employment Law 175 (1992)).  Thus, the Court must decide whether a reasonable juror could find that the extent of complained-of conduct was sufficiently "extreme to amount to a change in the terms and conditions of employment." Id.

In this case, Jovan has proffered evidence that Anderson repeatedly insulted his national

origin.  For example, Anderson brought in pictures of "uncivilized poorly clothed and dirty tribal

folk and sarcastically inquired if these were '[his] people.'"  (Decl. of Jovan ¶ 26.)  On a separate

occasion, Anderson asked if Sri Lanka had any terrorists and if it was close to Afghanistan and

Iraq. (Jovan Dep. 198.)  Anderson also inquired as to why Jovan brought salads for lunch instead

of "your real food," and then asked "do you guys eat raw meat, do you eat snails."  (Jovan Dep.

199.)

Taken in isolation, these comments likely would not violate Title VII; however, they

occurred within a relatively brief period – Jovan was terminated ten days after Anderson began as

the full-time HR Manager.  Considered in the light most favorable to Jovan, Anderson's conduct

would support a jury finding of a hostile work environment.  Accordingly, summary judgment

will be denied because a genuine issue of material fact exists as to whether the harassment was

sufficiently severe or pervasive to constitute a hostile work environment.

### 2.    Title VII discriminatory discharge (§ 2000e–2(a))

Jovan also alleges that the termination of his employment constitutes national-origin

discrimination in violation of Title VII.  Absent direct evidence of discrimination, the Court must

analyze Jovan's discrimination claim under the three-step burden-shifting framework set forth in

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Fakete v. Aetna, Inc., 308 F.3d 335,

337-38 (3d Cir. 2002).  First, a plaintiff must establish a prima facie case of discrimination.

Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003).  Then the employer may advance

a "legitimate, nondiscriminatory reason" for the adverse employment action, which the plaintiff

may ultimately rebut by showing that "the employer's proffered reasons were merely a pretext for

discrimination, and not the real motivation for the unfavorable job action." Id.

To establish a prima facie case of national-origin discrimination Jovan must establish that: (1) he was a member of a protected class; (2) he was qualified for his position; and (3) nonmembers of the protected class were treated more favorably. Abramson, 260 F.3d at 281-82. When considering whether Jovan has established a prima facie case, a court's analysis should be guided by the principle that "there is a low bar for establishing a prima facie case of employment discrimination." Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ., 470 F.3d 535, 539 (3d Cir. 2006). In this case, the parties' only dispute the third prong. Defendant's position is that Anderson did not treat Jovan differently from any other individuals. Jovan has, on the other hand, proffered evidence that Anderson favored Puerto Rican employees and, indeed, filled Jovan's position with a Puerto Rican employee.[2] (Decl. of Rebecca Barth ¶ 7.) Thus, at least for purposes of summary judgment, the Court finds that Jovan has established a prima facie case of discrimination.

Because Jovan has established a prima facie case of discrimination, the burden shifts to Pilgrim's Pride to show that the termination of Jovan's employment was taken for legitimate, nondiscriminatory reasons. In this case, Pilgrim's Pride has introduced evidence that Jovan's employment was terminated for insubordination during a meeting on November 2, 2004, between Anderson, Boyer, and Jovan. (Decl. of Dave Boyer ¶¶ 8-14.) Insubordination is a legitimate reason for terminating employment, and thus Pilgrim's Pride's burden is satisfied.

---

[2] Pilgrim's Pride correctly notes that it had no obligation to fill Jovan's position with a Sri Lankan employee (indeed, Defense Counsel in oral argument indicated that to do so would be difficult given Central Pennsylvania's demography). Nevertheless, Plaintiffs' theory is that Anderson discriminated against employees who were not Puerto Rican.

Jovan must now show that the nondiscriminatory reason for terminating his employment is merely pretextual.  The Third Circuit has held that on summary judgment, a plaintiff can meet this burden "by pointing 'to some evidence, direct or circumstantial, from which a factfinder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'"  Jones v. School Dist. of Philadelphia, 198 F.3d 403, 413 (3d Cir. 1999) (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)).

In this case, Jovan has demonstrated that his employment history at Pilgrim's Pride was virtually unblemished until Anderson arrived at the New Oxford facility, and he was discharged shortly after she became the manager.  Furthermore, upon her arrival, Anderson allegedly made a number of comments outside of Jovan's presence,[3] that could suggest to a reasonable juror that the justification given for firing Jovan was pretext.  Finally, as a result of Jovan's unemployment hearings, the Department of Labor and Industry of the Commonwealth of Pennsylvania found that none of the justifications given by Pilgrim's Pride for discharging Jovan were substantiated. (Pls' Ex. E.)  While the unemployment hearings are not binding, they supports a finding that a genuine issue of material fact exists as to Pilgrim's Pride's justifications were pretextual  Cf. Frankhouser v. Federal-Mogul Corp., No. 98-1067, 1999 U.S. Dist. LEXIS 283, at *8 (E.D. Pa. Jan. 11, 1999) (employer's burden to offer a legitimate, nondiscriminatory motive met on summary judgment based upon unemployment hearing testimony).  Therefore, the Court will deny summary judgment on Jovan's discriminatory discharge claims.

---

[3] For example, in her deposition, Zepeda's wife testified that during a dinner conversation, Anderson made reference to Jovan as "that monkey, I am going to lower him to the ground."  (Raquel Zepeda Dep. 7.)

10

**B.      Zepeda's Title VII claims**

Zepeda alleges that Defendant violated Title VII by creating a hostile work environment and by retaliating against him for engaging in protected activity.  The Court will address his claims in turn.

**1.      Hostile work environment**

Zepeda claims that he was subjected to a hostile work environment because of his Mexican national origin.  In support of his claim, Zepeda contends that after Jovan made allegations during his unemployment hearing of Pilgrim's Pride's illegal hiring practices, Anderson started referring to Mexicans negatively, saying that Pilgrim's Pride needed to "get real people with real documentation.  Maxi Staff [a contractor] was going to bring Puerto Ricans. They're Americans."  (Zepeda Dep. 238-39.)  Zepeda also alleges that Anderson stated that "we always have trouble with pinché[4] Mexicanos, f'ing Mexicans, because their paperwork always come back wrong." (Id.)

As discussed above, to prove a hostile-work-environment claim, a plaintiff must show that the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).  Although Anderson's comments are offensive, Zepeda does not dispute that they were isolated.  Moreover, Zepeda did not complain about her comments, nor has he proffered evidence that he felt harassed by them.  Accordingly, the Court will grant Defendant's motion for summary judgment as to Zepeda's hostile-work-environment claims.

---

[4] In his deposition, Zepeda defined the word "pinché" as "the F word for Mexicans." (Zepeda Dep. 135.)

11

**2.      Title VII retaliation (§ 2000e–3(a))**

Title VII's anti-retaliation provision prohibits an employer from discriminating against an employee who "opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

In Plaintiffs' amended complaint, Zepeda alleges that Pilgrim's Pride retaliated against him for "supporting Plaintiff Jovan's charges of discrimination that were filed with the Equal Employment Opportunity Commission and supporting [Jovan's] claim for unemployment compensation benefits." (Am. Compl. ¶ 36.) To state a prima facie case of Title VII retaliation, Zepeda must prove three elements: (1) he engaged in activity protected by Title VII; (2) the employer took action against him that would be materially adverse to a reasonable employee; and (3) there was a causal connection between his participation in the protected activity and the adverse action. Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006); Burlington N. & Santa Fe Ry. Co. v. White, 126 S. Ct. 2405, 2409 (2006).

The Title VII anti-retaliation provision "protects those who participate in certain Title VII proceedings (the 'participation clause') and those who oppose discrimination made unlawful by Title VII (the 'opposition clause')." Id. Under both the participation and opposition clauses, a plaintiff's activity is not protected unless she complains of discrimination on the basis of race, color, sex, religion, or national origin. Slagle v. County of Clarion, 435 F.3d 262, 267-68 (3d Cir. 2006) (plaintiff's "vague allegations of 'civil rights' violations" does not constitute participation for purposes of Title VII"); Barber v. CSX Distribution Servs., 68 F.3d 694, 701-02 (3d Cir. 1995) (plaintiff's "general complaint of unfair treatment" does not constitute opposition

12

for purposes of ADEA).  Title VII, however, clearly protects an employee that protests what she

"believes in good faith to be a discriminatory practice."  <u>Aman v. Cort Furniture Rental Corp.</u>, 85

F.3d 1074, 1085 (3d Cir. 1996).

Furthermore, Title VII only covers the activity of a plaintiff, not that of a third-party's

protected activity.  <u>Fogleman v. Mercy Hospital, Inc.</u>, 283 F.3d 561, 568-70 (3d Cir. 2002)[5]; <u>see</u>

<u>also</u> <u>Moore v. City of Philadelphia</u>, 461 F.3d 331, 351 n.11 (3d Cir. 2006) (refusing to revisit

<u>Fogleman</u>'s holding  in the Title VII context).  Mere association with a complainant does

constitute opposition or participation.  The Third Circuit, however, has also recognized that a

plaintiff can state a claim under Title VII's anti-retaliation provision if a defendant incorrectly

<u>perceives</u> that the plaintiff engaged in protected activity.  <u>Fogleman</u>, 283 F.3d at 571-72 ("it

matters not whether the reasons behind the employer's discriminatory animus are actually correct

as a factual matter").

Zepeda alleges that he engaged in two forms of protected activity: first, he "participated"

in Jovan's EEOC hearings; and second, he "opposed" discrimination through Jovan's

unemployment hearings.  It is clear from the record that Zepeda participated in Jovan's EEOC

---

[5] In <u>Fogleman</u>, a plaintiff claimed that the defendant retaliated against him because his
father had filed an age-discrimination claim against the defendant.  The Third Circuit rejected
plaintiff's retaliation claim:

> Although we recognize that allowing an employer to retaliate against
> a third party with impunity can interfere with the overall purpose of
> the anti-discrimination laws, we believe that by referring to 'such
> individual,' the plain text of these statutes clearly prohibits only
> retaliation against the actual person who engaged in protected
> activity.

283 F.3d at 564.

hearings: he signed a written declaration.  (Def's Ex. Q.)  But that declaration – prepared by

Pilgrim's Pride's attorney, Mr. Ullrich – in no way supported Jovan's allegations; indeed, the

declaration flatly contradicts Jovan's contention that Pilgrim's Pride engaged in illegal hiring

practices.  Zepeda has offered no evidence suggesting that any adverse actions were taken against

him because of his participation before the EEOC.  Accordingly, while the Court finds that

Zepeda's participation in Jovan's EEOC hearings constituted protected activity,[6] he has not met

his burden to show that such activity led to retaliation.

The record is less clear as to Zepeda's opposition to Pilgrim's Pride's alleged

discrimination.  Zepeda contends that he opposed discrimination by refusing to speak out against

Jovan.  Specifically, Zepeda alleges that before Jovan's unemployment hearing, Ullrich

approached him and asked him to testify against Jovan.  Zepeda refused, and told Ullrich: "I

don't know what you want me to tell you, but Jonily [Jovan] was not a bad person. . . don't go

around the bush, open your eyes very clearly and see who the problem is.  It was not Jonily.  It is

Olga.  And if you want to cut this problem from the bottom of it, that's what you got to do."

(Zepeda Dep. 199.)

After Zepeda refused to testify, Ullrich asked Zepeda to prepare written statements

rejecting Jovan's contention that Pilgrim's Pride had engaged in illegal hiring practices.  Zepeda

prepared the written statements, in which he claimed that the "one person that [Jovan] thought

_____

[6] At least with regard to the first element of a prima facie retaliation claim, it is immaterial that Zepeda's participation did not directly assist Jovan.  Merritt v. Dillard Paper Co., 120 F.3d 1181, 1186 (11th Cir. 1997) ("The anti-retaliation provision is straightforward and expansively written.  Congress chose the language 'testified' and 'participated in any manner' to express its intent about the activity to be protected against retaliation.  The word 'testified' is not preceded or followed by any restrictive language that limits its reach.  As to 'participated in any manner,' the adjective 'any' is not ambiguous; it has a well-established meaning.").

was illegal . . . Olga [Anderson] said to go ahead and hire the person." (Def's Ex. Q.) Zepeda further testified in his deposition that he was afraid that he would be fired "because I told [Ullrich] that they need to do something about Olga." (Zepeda Dep. 201.)

However, the record is devoid of any evidence that Zepeda's support of Jovan related to opposition to alleged discrimination. Even when reading the record liberally in favor of Zepeda, there is no suggestion that Zepeda viewed Anderson's decisions and actions against Jovan as motivated by discriminatory animus. At most, the record indicates that Zepeda viewed Anderson as an ineffective, vindictive leader and spoke out against her. Such opposition is not protected by Title VII, because he never "explicitly or implicitly alleged that [Jovan's national origin] was the reason for Anderson's alleged unfairness." Barber, 68 F.3d at 702. Because Zepeda has made no showing that he was retaliated against for participating in Jovan's EEOC claim or opposing unlawful conduct, the Court will grant Defendant's motion for summary judgment with respect to Zepeda's Title VII retaliation claims.

### C.     Plaintiff's wrongful discharge and negligent supervision claims

In Count III of Plaintiffs' amended complaint, Plaintiffs allege that "Defendant wrongfully discharged Plaintiffs from employment." (Am. Compl. ¶ 53.) In Count IV, Plaintiffs allege that "Defendant negligently and/or recklessly failed to supervise Manager Olga Anderson." (Am. Compl. ¶ 66.) Defendant moves for summary judgment on these claims because the PHRA and Title VII preempt wrongful-discharge claims and negligent-supervision claims predicated upon discrimination. This Court agrees. See Engle v. Milton Hershey Sch., 2007 U.S. Dist. LEXIS 3975, at *23-24 (M.D. Pa. Jan. 19, 2007); Clay v. Advanced Computer Applications, 559 A.2d 917, 918 (Pa. 1989) ("the PHRA provides a statutory remedy that

15

precludes assertion of a common law tort action for wrongful discharge based upon discrimination."); Watkins v. Rite Aid Corp., 2006 U.S. Dist. LEXIS 50784, at *11-15 (M.D. Pa. July 25, 2006) ("The PHRA preempts common law negligent supervision claims against employers when, as in the case sub judice, such claims arise from, and form an integral part of, the PHRA-prohibited discriminatory conduct."). Thus, Defendant's motion for summary judgment will be granted on Plaintiffs' state-law claims.

     **D.     Plaintiffs' motion to amend**

     In addition to the Title VII claims, Plaintiffs have moved for leave to amend the complaint pursuant to Federal Rule of Civil Procedure 15(a) to include a state-law defamation claim against Defendant related to statements made by non-parties Johana Vasquez and Patricia Gravatt. Plaintiffs contend that, during discovery, they learned that Vasquez and Gravatt made defamatory statements related to Zepeda.

     Rule 15(a) provides that "leave shall be freely given when justice so requires," but the Third Circuit has held that a district court may exercise its discretion to deny such a motion in cases of "undue delay, bad faith, dilatory motive, prejudice, and futility." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997). Here, although Plaintiffs arguably were unaware of the statements until discovery, the desire to avoid piecemeal litigation does not overcome the prejudice inherent in allowing amendment at this late stage in the proceedings. Permitting the amendment would almost certainly affect the ability of the parties to prepare adequately for trial or would cause unnecessary delay in the trial calendar.

     Moreover, such an amendment would be futile. Plaintiffs do not allege that Pilgrim's Pride adopted, ratified, or otherwise was aware of the allegedly defamatory statements. Nor do

Plaintiffs allege that Pilgrim's Pride, or any of its employees, published such statements to third-parties.  Thus, Plaintiffs' motion for leave to file a second amended complaint will be denied.

IV.     **CONCLUSION**

For the foregoing reasons, the Court will grant Defendant's motion for summary judgment in part, and will deny Plaintiffs' motion for leave to file an amended complaint.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JONILY L. JOVAN and LUIS ZEPEDA,** : | **Civil Action No. 1:05-CV-2443** |
| **Plaintiff** : | |
| : | **(Chief Judge Kane)** |
| **v.** : | |
| : | |
| **PILGRIM'S PRIDE CORP.** : | |
| **Defendant** : | |

## ORDER

**AND NOW**, on this 27th day of February, 2007, upon due consideration of the Court and for the reasons set forth in the accompanying memorandum, **IT IS ORDERED THAT** Defendant's motion for summary judgment is **HEREBY GRANTED** in part as follows: (1) Plaintiff Zepeda's claims are dismissed in their entirety; and (2) Plaintiff Jovan's state-law claims are dismissed.  **IT IS FURTHER ORDERED THAT** Plaintiffs' motion for leave to file a second amended complaint is **DENIED**.  The Clerk of Court is directed not to enter judgment until the conclusion of this case.


                                                      S/ Yvette Kane
                                                      Yvette Kane, Chief Judge
                                                      United States District Court
                                                      Middle District of Pennsylvania